UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARMED ENTERTAINMENT, LLC,

      Plaintiff,

v.

PRIMEONE INSURANCE
COMPANY,

      Defendant.

Case No. 22-10893
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [18] AND DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [17]**

---

After Charmed Entertainment LLC's commercial establishment was damaged in a fire, it asked its insurer, PrimeOne Insurance Company, to pay for its losses under the insurance policy. PrimeOne refused, claiming that Charmed made material misrepresentations when securing the policy. So Charmed sued for breach of contract in state court. (ECF No. 1-2, PageID.9–11.) PrimeOne then removed the case to federal court. (ECF No. 1, PageID.1–4.)

In time, PrimeOne moved for summary judgment, arguing that the Court should find its rescission of the insurance contract appropriate. (*See* ECF No. 18.) Charmed moved for partial summary judgment on the issue of rescission as well. (*See* ECF No. 17.) The Court finds these motions have been adequately briefed and will rule without hearing. *See* E.D. Mich. 7.1(f).

For the reasons discussed below, the Court finds that triable issues of fact remain as to whether Charmed's misrepresentations were material. So both motions will be denied.

## I. Background

The undisputed facts, unless otherwise noted, are as follows.

Charmed Entertainment is a limited liability company that owned an adult-entertainment establishment named Charmed that was located at 403 S. Dix Street in Detroit. (ECF No. 17-2, PageID.161.) Charmed Entertainment was comprised of two members, Red Lemon LLC, and Dauntless Ventures, LLC, that each owned a 50% stake in the company. (ECF No. 18, PageID.264.) Jeremy O'Neil is the sole member of Red Lemon, while Luigi Ceneri and Richard Geller are the only members of Dauntless Ventures. (*Id*.)

On January 29, 2019, Charmed applied for commercial insurance with PrimeOne through its agent, Tabak Insurance. (ECF No. 18-9, PageID.321.) That application was signed by Richard Geller—who says he gave the insurance agent permission to e-sign the application on his behalf. (*Id*.) In the application, Charmed represented to PrimeOne that its business owner had 15 years of prior experience in the industry. (ECF No. 18-9, PageID.321.) In a follow-up email to Charmed's insurance agent, the underwriter for Charmed's PrimeOne policy, Woody White, stated that the insurance application should contain specific details of the "insured's experience in either ownership and/or managing this kind of business to satisfy the New Venture underwriting criteria." (ECF No. 18-10, PageID.330.) In response, a

2

representative from Tabak Insurance indicated that "the GM, Jeremy O'Neil (also a business partner) on behalf of the insured has successfully managed several similar businesses for a combined period of 15 years. Most recently Chix on Dix and Power Strip, with a successful track record of managing this type of operation." (*Id*.) Charmed also represented in its application for insurance that it did not have any "bouncers, security guards or door persons on the premises." (ECF No. 18-9, PageID.324.)

PrimeOne eventually issued the commercial policy, which included coverage for the building and Charmed's personal property. (*See* ECF No. 18-11, PageID.333–334.) Charmed's club opened sometime in March or April 2019. (ECF No. 17-2, PageID.162.) PrimeOne renewed the policy on January 31, 2020, after Charmed's insurance agent applied for renewal using the same answers regarding the insured's previous experience in the adult-entertainment industry and the lack of "bouncers, security guards, or door persons" on the premises. (*See* ECF No. 17-4, PageID.179, 182, 186.)

On March 19, 2020, Charmed's Dix street property caught fire. (ECF. No. 18-2, PageID.491–493.) The fire damaged the building and its contents. (*Id*.) Charmed timely submitted a claim to PrimeOne for the damages, losses, and expenses caused by the fire. (ECF No. 1-2, PageID.9; ECF No. 3, PageID.26.) After investigating, PrimeOne concluded that Charmed had materially misrepresented its answers to two questions in the insurance application and sent a letter rescinding the 2020 policy from its inception. (ECF No. 17-5, PageID.188–189.) Specifically, PrimeOne alleged

3

Charmed materially misrepresented O'Neil's prior experience successfully managing adult-entertainment establishments, and that it materially misrepresented the use of bouncers, security guards, or door persons on its premises. (*See id*.) PrimeOne rescinded the 2019 policy for the same reasons. (*See* ECF No. 17-6.)

In his deposition testimony, O'Neil admitted that he had no prior experience operating adult-entertainment businesses, nor did he have any prior experience in managing or operating a liquor-license establishment. (ECF No. 22-2, PageID.1467.) Additionally, O'Neil admitted that he never managed Chix on Dix, one of the clubs that Charmed's insurance agent represented O'Neil had 15 years of experience managing. (*Id*.) Charmed's other two owners both stated that they had no experience in the adult-entertainment industry either. (See ECF No. 22-3, PageID.69; ECF No. 22-4, PageID.1641.) But Charmed subsequently provided an affidavit from O'Neil stating that he was a "co-owner of the Flight Club gentlemen's club" for five years before purchasing Charmed, and although he had not operated the establishment, he "oversaw its financial books and records." (ECF No. 17-2, PageID.161.) PrimeOne disputes the veracity of this prior experience, asserting that this affidavit directly contradicts O'Neil's earlier deposition testimony. (ECF No. 21, PageID.768.)

Charmed also provided affidavits from two managers of its establishment who purportedly each had over 10 years of prior experience managing other adult establishments. Daren Lee stated that he managed Charmed for a year, starting in January 2019, and that at the time he was hired, he had 10 years of prior experience managing other adult-entertainment clubs, including Chix on Dix. (ECF No. 17-9,

PageID.255). PrimeOne disputes that Lee was employed by Charmed on or around January 29, 2019, the date of the original application, or on January 30, 2019, the date when supplemental information was provided to the insurance underwriter by Charmed's agent. Instead, PrimeOne points to Charmed's financial records that show Lee was first paid in March 2019. (*See* ECF No. 21-12, PageID.881 ("The records produced indicate that the Plaintiff opened for business on March 10, 2019. The first end of day reports were run by Darren Lee. The March 10, 2019 activity is the first time Darren Lee appears in Plaintiff's financial records.").)

Charmed also says it hired Robert Lee Brown as a manager in April 2019. Brown stated in his affidavit that he had 10 years of experience managing the Pantheon Club, another adult-entertainment establishment, before being hired by Charmed in April 2019. (ECF No. 17-10, PageID.258.) But Brown says nothing about how long he remained working at Charmed. According to a supplemental affidavit submitted by O'Neil, Brown remained a manager at Charmed until the March 2020 fire. (ECF No. 17-2, PageID.162.)

## II. PrimeOne's Failure to Comply with the Rules

Before addressing the merits, a word on PrimeOne's failure to comply with this Court's case management requirements and the Federal Rules of Civil Procedure.

As Charmed aptly points out in its response brief, PrimeOne's motion for summary judgment is replete with citations to entire exhibits without pincites to specific record evidence to support its factual assertions—a clear violation of this Court's case management requirements. (*See* ECF No. 10, PageID.98 (stating that

5

"each statement of fact must be supported with a pincite to specific record evidence.").) This also violated Federal Rule of Civil Procedure 56(c)(1), which provides that a party must support its assertion that a fact is or cannot be disputed by "citing to particular parts of materials in the record." "A district court is not required to search the entire record to establish that it is bereft of a genuine issue of material fact." *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (internal citation, quotation marks, and alteration omitted). "'[J]udges are not like pigs, hunting for truffles' that might be buried in the record." *Id.* at 736 (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) (noting that a district court is neither required to speculate on which portion of the record a party relies, nor is it obligated to "wade through" the record for specific facts).

Nonetheless, given the posture of this case, the Court has reviewed the record and will consider PrimeOne's motion. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it *may* consider other materials in the record.") (emphasis added). It trusts that future filings will be models of compliance.

### III. Standard

Federal Rule of Civil Procedure 56 provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When there are cross-motions for summary judgment, as there are here, the Court must consider each motion separately and take the facts in the light most favorable to the non-moving

6

party. *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021). And it is not necessarily the case that either party is entitled to summary judgment. *See id.* When considering PrimeOne's motion, the evidence is viewed in the light most favorable to Charmed and the initial (and ultimate) burden is on PrimeOne to show that it is entitled to judgment as a matter of law. *See id.* The opposite is true when considering Charmed's motion.

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary-judgment motion, "the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citation omitted).

### IV. Michigan Contract Law

The court has diversity jurisdiction of this insurance coverage dispute under 28 U.S.C. § 1332. Federal courts exercising diversity jurisdiction apply the law of the forum state. *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008). Thus, Michigan contract law governs here, as both parties acknowledge in their briefing.

Under Michigan law, an insurance contract is generally interpreted like any other contract. *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 354 (6th Cir. 2012); *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). The policy application, declarations

7

page, and the policy itself constitute the contract. *See Royal Prop. Grp., LLC v. Prime Ins. Syndicate, Inc.*, 706 N.W.2d 426, 432 (Mich. Ct. App. 2005) (citing *Hall v. Equitable Life Ass. Soc'y of the U.S.*, 295 N.W. 204, 206 (Mich. 1940)).

When a provision of an insurance policy is not mandated by statute, "the rights and limitations of the coverage are entirely contractual[.]" *See Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). So common law defenses like fraud, duress, and waiver may be invoked to avoid enforcement of an insurance policy. *See Ibrahim v. Liberty Mut. Pers. Ins. Co.*, No. 22-10015, 2023 WL 2637370, at *3 (E.D. Mich. Mar. 24, 2023) (citing *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012)).

Here, PrimeOne says that Charmed's fraudulent misrepresentations in its application for insurance permit it to rescind the 2020 policy. (*See* ECF No. 18, PageID.270.)

Michigan law permits rescission of an insurance policy when the insured makes a material misrepresentation in the application for insurance. *Lake States Ins. Co. v. Wilson*, 586 N.W.2d 113 (Mich. Ct. App. 1998), *appeal denied,* 598 N.W.2d 349 (Mich. 1999). A misrepresentation is material if the insurer would have charged a higher premium or not accepted the risk had it known the true facts. *Old Life Ins. Co. of Am. v. Garcia*, 411 F.3d 605, 611 (6th Cir.), *adhered to as amended sub nom. Old Line Life Ins. Co. of Am. v. Garcia*, 418 F.3d 546 (6th Cir. 2005) (citing *Oade v. Jackson Nat'l Life Ins. Co. of Mich.*, 632 N.W.2d 126 (Mich. 2001)). Importantly, under Michigan law, an insurer is entitled to rescind the policy whether the misrepresentation was innocent or intentional, as long as the insurer relied on it.

8

*Lash v. Allstate Ins. Co.*, 532 N.W.2d 869, 872 (Mich. Ct. App. 1995) ("Rescission is justified in cases of innocent misrepresentation if a party relies upon the misstatement, because otherwise the party responsible for the misstatement would be unjustly enriched if he were not held accountable for his misrepresentation.").

## V. Analysis

PrimeOne is thus entitled to rescind the policy if it can show: (1) that Charmed made a misrepresentation in its insurance application; and (2) that the misrepresentation was material. Both parties ask the Court to decide the issues of misrepresentation and materiality as a matter of law.

PrimeOne alleges that Charmed made two material misrepresentations in its insurance application, which it relied on in issuing the policy and setting the rate. (ECF No. 18, PageID.272–275.) Specifically, PrimeOne says that Charmed misrepresented its owner's experience successfully operating similar businesses and whether it maintained security on the premises. The Court addresses each in turn.

### A. Prior Ownership or Management Experience

Start with the alleged material misrepresentation on management experience. In its application for insurance, Charmed, through its insurance agent, represented that its owner had 15 years of experience in the adult-entertainment industry. (ECF No. 17-4, PageID.179 (responding "15" to a question stating, "how many years of experience does the business owner have in this industry?").) And upon further inquiry from the insurance underwriter for additional details on this prior experience, Charmed's insurance agent represented that its co-owner and manager, O'Neil, had

9

15 years of successful prior experience managing similar establishments, including Chix on Dix and Power Strip. (ECF No. 18-10, PageID.330.) This representation was undisputedly false, as Charmed concedes in its response to PrimeOne's motion. (*See* ECF No. 20, PageID.729.) During his deposition, O'Neil admitted he never operated Chix on Dix or any other adult-entertainment establishment—he had zero years of experience in the industry.[1] (ECF No. 22-2, PageID.1467.) So Charmed made a misrepresentation on its insurance application.

But this is not the end of the inquiry. To be entitled to rescind the policy as a matter of law at this stage, PrimeOne must also establish that the misrepresentation was material, meaning that PrimeOne would not have issued the policy or would have charged a higher premium if given the correct information. *Peatross v. Liberty Mut. Pers. Ins. Co.*, 575 F. Supp. 3d 887, 891 (E.D. Mich. 2021), *aff'd*, No. 22-1022, 2022 WL 17169008 (6th Cir. Nov. 22, 2022) ("A fact or representation in an application for

---

[1] Charmed's motion for partial summary judgment includes an affidavit from O'Neil stating he had five years of experience managing the books of Flight Club, another adult-entertainment establishment that he claims to have co-owned. (ECF No. 17-2, PageID.161.) But this statement of fact directly conflicts with O'Neil's earlier deposition testimony that he had no prior experience operating any other adult-entertainment establishment. The Court notes well-established precedent in this Circuit that "[a]fter a motion for summary judgment has been filed, a party cannot create a material issue of fact by filing an affidavit which contradicts his earlier deposition testimony." *Preston v. Clayton Homes, Inc.*, 167 F. App'x 488, 491 (6th Cir. 2006) (collecting cases). "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). Charmed provides no such justification here. So the Court will not consider this fact in deciding the parties' motions.

insurance is material when communication of it would have resulted in an insurer rejecting the risk or charging an increased premium.").

PrimeOne conclusively states that Charmed's misrepresentation was material to its decision to issue the underlying policy and to set the proper rate. (ECF No. 18, PageID.276.) In support of its contention, PrimeOne relies on the deposition of underwriter, Woody White, and PrimeOne Chief Operating Officer, Eric Jarvis. (*See* ECF Nos. 18-15, 18-16.)[2] But that is not what this testimony undisputedly establishes. As discussed, PrimeOne failed to point to any specific statements from the depositions that conclusively establish materiality. And upon the Court's independent review of the record evidence and taking that evidence in the light most favorable to Charmed, it finds that there is a genuine dispute of fact as to whether the misrepresentation was material—or put differently, whether PrimeOne would have issued the policy or would have charged a higher premium if it had the correct information.

To PrimeOne's credit, White did testify that if he had known that the ownership of Charmed lacked experience in the business—or had a history of failure

---

[2] In its response to Charmed's motion for partial summary judgment, PrimeOne also submitted an affidavit of Stacey Schwenk, the Chief Underwriting Officer at Norse Specialty Insurance Services, which managed underwriting of PrimeOne insurance policies. (*See* ECF No. 21-14, PageID.887–890.) But this affidavit was unsigned, and so the Court will not consider it. *See Sfakianos v. Shelby Cnty. Gov't*, 481 F. App'x 244, 245 (6th Cir. 2012) (finding the district court properly declined to consider unsigned affidavit on motion for summary judgment and noting that "an 'unsigned affidavit' is a contradiction . . . . [b]y definition an affidavit is a 'sworn statement in writing made . . . under an oath or on affirmation before . . . an authorized officer") (internal citation and quotation marks omitted).

in the business—he might have rejected the risk or set a higher rate. (ECF No. 18-15, PageID.632–633.) And Jarvis testified that because of the inherent riskiness of an adult-entertainment business, PrimeOne would only approve a policy upon more careful scrutiny and thoughtfulness. (ECF No. 18-16, PageID.646.) He said that PrimeOne "would require a higher level of information about" the business, including with respect to "ownership experience or management experience of that kind of establishment, which would be one of the key factors in underwriting that particular risk and rating that risk." (*Id.*)

But there is also evidence showing that O'Neil himself did not have to have the management experience—and certainly not 15 years of it—to qualify for the policy. PrimeOne's underwriting guidelines provide that certain "risks shall not be eligible for the program without prior approval from executive management of [PrimeOne]" including the risk of insuring "adult-establishments" or any "[n]ew [v]entures with less than 3 years in business, ownership or comparable [m]anagement [e]xperience." (ECF No. 18-17, PageID.669.) According to these guidelines, for a PrimeOne insurance policy to be issued for a new venture with less than three years of experience, the underwriter must get explicit prior approval from a member of PrimeOne's executive management team. (*See* ECF No. 18-5, PageID.598–602.) But the guideline language is ambiguous as to who must have the requisite prior management experience—i.e., whether the requirement may be satisfied by a manager employed by the insured or whether it must be an owner of the insured itself.

The deposition testimonies of PrimeOne's agents, White and Jarvis, suggest that a manager's prior successful experience in the industry could satisfy the underwriting guidelines. While the insurance application asked, "how many years of experience does the *business owner* have in this industry," White testified that if a business had managers with three years of experience, it would have met his underwriting criterion. (ECF No. 18-5, PageID.612 (emphasis added).) And when pressed on whether a mistake or error of the name of the manager with the requisite experience would impact his writing of a policy, White testified that "it would not stop [him] from continuing the risk." (*Id.* at PageID.619.) White also testified that the prior experience question on the insurance application applies to either a "business owner or managers." (*Id.* at PageID.618.) Jarvis corroborated this understanding, stating that either the owner or the manager could have the requisite experience so long as they had a successful track record. (ECF No. 18-16, PageID.639, 647; *see also id.* at PageID.646 ("[I]t'd have to be successful experience, and I'm not sure that three years is sufficient or if it's the same like, kind, or type or size of establishment. There'd have to be a little bit more investigation into that.").)

Charmed says that two managers other than O'Neil had the requisite experience for the policy to issue, and so the misrepresentation was not material because Charmed would have otherwise satisfied the underwriting requirements. First, Daren Lee says he worked as a manager at Charmed for about a year starting in January 2019, when the first policy was issued. (ECF No. 17-9, PageID.255). Lee says he had over 10 years of prior experience managing other adult-entertainment

13

establishments, including Chix on Dix. (*Id*.) Additionally, Robert Brown, who allegedly managed Charmed's establishment from April 2019 through the March 2020 fire, says he had 10 years of prior experience managing the Pantheon Club, another adult-entertainment establishment. (ECF No. 17-10, PageID.258.)

PrimeOne argues this is not enough. It contends that neither Lee nor Brown were actually working as manager at the time of the issuance of the January 2020 policy, citing Charmed's financial records that show Lee's first check was issued sometime in March 2019 and that he did not appear in the payroll after June 17, 2019. (ECF No. 21-12, PageID.881.) And Brown's first check was not issued until sometime in June 2019, and that he does not appear in Charmed's financial records after mid-August 2019. (*Id*.) So neither manager, according to PrimeOne, was there at the time the policy was issued nor for the majority of the relevant coverage period

PrimeOne also says that Lee's prior experience was unsuccessful, and that Chix on Dix was shuttered in 2016. But it relies on two online articles in support of this contention, which are inadmissible hearsay that the Court cannot consider on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 225–26 (6th Cir. 1994) ("It is well settled that only admissible evidence may be considered by the trial court ruling on a motion for summary judgment."); *see also Turner v. City of Taylor*, 412 F.3d 629, 652 (6th Cir. 2005) (affirming summary judgment because a "newspaper article was inadmissible hearsay" that "could not create a genuine issue of material fact for trial"); *Tolliver v. Fed. Republic of Nigeria*, 265 F. Supp. 2d 873, 876 (W.D. Mich. 2003) (finding internet articles "are rife with hearsay and were not

14

properly authenticated by persons with personal knowledge" so they "do not constitute proper evidence under Rule 56(e)").

Taking the admissible record evidence in the light most favorable to Charmed, a reasonable jury could find that PrimeOne would have issued the policy if it had the correct information. Based on the testimony of White and Jarvis, it is clear that either an owner or a manager's prior experience in the adult-entertainment industry could satisfy the three-year-experience requirement so long as that experience was successful. Charmed has provided evidence that it had at least two managers with over 10 years of experience managing other adult-entertainment establishments who say they were also managing Charmed at the time of the issuance of the  2020 policy and throughout the coverage period.

And while PrimeOne's evidence that Lee was only on the official payroll for Charmed from March to June of 2019 does seriously call into question the veracity of Lee's sworn statement that he was a manager at Charmed from January 2019 through January 2020 and O'Neil's supplemental affidavit that Lee continued to work as a manager at Charmed until about or before March 2020, it is not the Court's duty to weigh the credibility of each party's evidence at summary judgment. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) ("It is an error for the district court to resolve credibility issues against the nonmovant . . .  any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true."). So at the summary-judgment stage, the Court must take Charmed's direct evidence that Lee was managing its operation from January 2019 to January 2020 as true—a

jury will have to ultimately resolve credibility issues on this fact raised by the counter evidence proffered by PrimeOne. So too as to whether Brown managed Charmed through the March 2020 fire. Additionally, PrimeOne has failed to provide admissible evidence to establish whether Lee or Brown's prior experience was successful. Thus, the Court finds a dispute of material fact: whether Lee or Brown satisfies the requirement that a manager have at least three years of prior successful experience in the adult-entertainment industry.

In sum, the Court finds that, because Charmed has produced evidence that PrimeOne could have issued an insurance policy to Charmed based on its managers' prior experience, a genuine issue of fact exists. A jury should determine whether Charmed's misrepresentation was material—that is, whether PrimeOne would have issued Charmed's policy or charged a higher premium had it known the correct information. *See Ibrahim v. Liberty Mut. Pers. Ins. Co.*, No. 22-10015, 2023 WL 2637370, at *6 (E.D. Mich. Mar. 24, 2023) (finding triable issue of fact on materiality of misrepresentation where plaintiff provided an affidavit challenging Defendant's declaration that it would not have issued the insurance policy had it known the correct information).

And for similar reasons, the Court also denies Charmed's motion for partial summary judgment on the issue of materiality. For one, as noted above, the testimonies of White and Jarvis provide support that PrimeOne might not have issued the policy or might have charged a higher premium if it had known the correct information. White testified that if he knew Charmed had lied about prior experience

16

in the industry and prior successful management experience in the industry, he might
have declined to insure the business or he might have charged a higher premium.
(ECF No.18-15, PageID.631–632.) And even though a manager's prior successful
experience could have satisfied PrimeOne's underwriting criterion, Charmed's
financial records—which show Lee getting his first paycheck in March 2019 and last
paycheck in June 2019, and which only show Brown appearing in the records from
June 2019 to August 2019—raise a factual dispute regarding whether Lee and/or
Brown actually worked for Charmed at the time of the insurance application in 2020.
Additionally, the record lacks first-hand evidence as to whether Brown and Lee—the
only two individuals with relevant experience—had prior success in managing their
previous operations. And both Jarvis and White emphasized that a manager's prior
experience must have been successful to satisfy the underwriting criteria.

Taking this evidence in the light most favorable to PrimeOne compels the
conclusion that a reasonable jury could find that PrimeOne would not have issued
the policy to Charmed if it had the correct information. So the Court finds that
summary judgment is precluded based on this record.

### B. Bouncers, Security Guards, or Door Persons

Next, PrimeOne says that Charmed made another material misrepresentation
when it stated on the insurance application that it did not employ any "bouncers,
security guards, or door persons" on its premises. (*See* ECF No. 18-9, PageID.321.)

First consider whether this statement was, in fact, a misrepresentation.
PrimeOne contends that Charmed regularly had security guards, bouncers, or door

17

persons on the premises. In support of this contention, it provides dozens of checks or cash paystubs that Charmed made out to workers with the notes designating that the payment was for "security." (*See* ECF No. 18-14, PageID.520–557.) The earliest of these dates back to March 2019, around the time that Charmed opened for business. (*Id* at. PageID.555.) PrimeOne also provided Charmed's weekly expense and profit sheets for various months between October 2019 and the end of February 2020. (*Id.* at PageID.558–579.) Multiple line-item expenses from each week are designated as payments for security, and a few from the later months are designated as payments for "security/valet." (*See id*.) An excerpt from one of Charmed's weekly expense lists is provided below:

| Additionally Weekly Expenses | | | | | | |
|---|---|---|---|---|---|---|
| Date | Check # | Payable To | FOR | | Amount | |
| 11/18/2019 | CASH | CHARMED | WEEKLY START | SINGLES PROFIT | $310.00 | $16,747.01 |
| 11/18/2019 | CASH | CHARMED | TIPOUT | PROFIT | $160.00 | $16,907.01 |
| 11/18/2019 | CASH | KIM GREENE | TIP SPLIT | | $90.00 | $16,817.01 |
| 11/18/2019 | CASH | SLAP FEST | CONTEST | | $100.00 | $16,717.01 |
| 11/18/2019 | CASH | MEIJER | SUPPLIES | | $33.10 | $16,683.91 |
| 11/18/2019 | CASH | FUEL MART | ICE | | $7.98 | $16,675.93 |
| 11/18/2019 | CASH | PORTER | PORTER | | $50.00 | $16,625.93 |
| 11/18/2019 | CASH | DJ ERIIES | DAILY | | $125.00 | $16,500.93 |
| 11/18/2019 | CASH | PORTER | PORTER | | $50.00 | $16,450.93 |
| 11/18/2019 | CASH | CHUCK | SECURITY | | $75.00 | $16,375.93 |
| 11/19/2019 | CASH | CHARMED | BOTTLE RETURN | PROFIT | $500.00 | $16,875.93 |
| 11/19/2019 | CASH | CHARMED | VALET | PROFIT | $130.00 | $17,005.93 |
| 11/19/2019 | CASH | CHARMED | TIPOUT | PROFIT | $160.00 | $17,165.93 |
| 11/19/2019 | CASH | KIM GREENE | TIP SPLIT | | $60.00 | $17,105.93 |
| 11/19/2019 | CASH | HOST | DAILY | | $90.00 | $17,015.93 |
| 11/19/2019 | CASH | DJ RICH | DAILY | | $125.00 | $16,890.93 |
| 11/19/2019 | CASH | DAMONT | SECURITY | | $150.00 | $16,740.93 |
| 11/19/2019 | CASH | CHUCK | SECURITY | | $100.00 | $16,640.93 |
| 11/19/2019 | CASH | DENIRO | OPEN/CLOSE | | $75.00 | $16,565.93 |
| 11/19/2019 | CASH | TONE | SECURITY | | $40.00 | $16,525.93 |
| 11/19/2019 | CASH | MEL. LIQ. | LIQUOR | | $398.48 | $16,127.45 |
| 11/19/2019 | CASH | KC LIQUOR | LIQUOR | | $178.03 | $15,949.42 |

(*Id.* at PageID.570.)

Charmed argues that PrimeOne has not shown that its statement was false. It points to Jarvis' testimony defining a security guard as "a person whose primary responsibility is to provide security to the premise" or "to regulate the entry of patrons

or potential patrons into the establishment." (ECF No. 18-16, PageID.651–652.) Charmed says that no workers met that definition, relying on O'Neil's declaration that the persons PrimeOne says were bouncers, security guards, or door persons actually performed various tasks at Charmed's club, "including stocking the bar; cleaning up; running errands; parking and moving cars (after the club ended its relationship with a separate valet service); collecting cover charges and checking IDs (a job also frequently performed by dancers); and escorting female employees to their cars." (ECF No. 17-2, PageID.162.)

O'Neil also explained that "these male employees would only work on the club's busiest days," and "only one or two were present during a shift." (*Id.*) O'Neil says that the payroll records designated these individuals as "security" only for accounting identification purposes to "distinguish them from other workers." (*Id.*) He further explained that "[t]hey did not carry weapons, were not wearing any uniform or clothing identifying them as security personnel, and at no time did the management of Charmed consider them to be 'security guards,' 'bouncers' or 'door persons' because they did not perform the duties typically performed by those categories of employees." (*Id.* at PageID.163.)

During his deposition, O'Neil was asked whether there were security guards that stuck around until the last waitress left on the night of the fire, and he responded that "*bouncers* outside walked every girl to the car." (ECF No. 22-2, PageID.1512 (emphasis added).) O'Neil was not asked any other questions about "bouncers, security guards, or door persons" at his deposition. O'Neil's declaration notes that,

while he referenced bouncers in his deposition testimony, he was not asked any follow-up questions or asked to explain what he meant when he used the term "bouncer." (ECF No. 17-2, PageID.163.) O'Neil says, "if I had been asked I would have explained that these workers performed many functions and were not considered to be bouncers or security guards."[3] *Id.*

Even taking this evidence in the light most favorable to Charmed, no reasonable jury could find that Charmed did not have security guards, bouncers, or door persons on the premises. PrimeOne provides dozens of payment receipts to workers from Charmed that were designated as payments for "security." Charmed also consistently listed "security" as the designation for multiple expenses in its weekly expense logs. And when, as O'Neil points out in his affidavit, security was also performing valet services after Charmed ceased its relationship with a separate valet provider, the expense log designated the expense as payment for "security/valet." It appears that Charmed was precise and accurate in labeling the payments listed on

---

[3] As the Court noted earlier, a post-deposition affidavit that directly conflicts with prior deposition testimony cannot be used to create an issue of fact in a response to a motion for summary judgment. *See Preston*, 167 F. App'x at 491. But O'Neil's affidavit does not necessarily directly contradict his deposition testimony pertaining to bouncers but rather it appears to expound upon it. It does not appear that O'Neil was ever actually questioned about whether the club had bouncers, security, or door persons on the premises, or what the workers' job descriptions or roles were—his only relevant deposition testimony on the issue was limited to an ambiguous statement that "bouncers outside walked every girl to the car" on the night of the fire with no follow up on the matter by PrimeOne's counsel. So the Court will consider O'Neil's affidavit as it pertains to the information on whether Charmed employed bouncers, security guards, and door persons at its club.

its expense sheet—suggesting that individuals who were paid and logged for security work were indeed performing security work.

In contrast, Charmed only vaguely suggests that the words "bouncer" and "security" mean something else—though it is not clear what. O'Neil says that the designation of these workers as "security" was an accounting practice to distinguish them from other workers, but this only further supports a finding that these workers were security guards. If this categorization was used by Charmed to distinguish employees, it would only make things more confusing to call non-security personnel "security" to distinguish them from other employees. Indeed, neither O'Neil nor Charmed explain why these individuals were categorized as security if that was not at least partially what they were responsible for. And O'Neil admits these workers were checking IDs and escorting dancers to their cars in the evenings—functions that unquestionably fall within the scope of what a door person or security would be doing. (*See* ECF No. 18-16, PageID.652 (Jarvis stating that "if they're at the door checking ID's, checking persons that are coming in, that's a door person").) That these workers also performed other tasks is of no moment as security guards that do other things in addition to securing the premises are still security guards. And as noted above, the overwhelming payroll and recordkeeping evidence establishes that Charmed itself thought of these individuals as primarily performing a security function. And while O'Neil later tried to walk it back, he referred to these employees as "bouncers." So the Court finds that Charmed misrepresented the fact that it employed security guards, bouncers, or door persons on the premises.

21

Next, the Court must consider whether that misrepresentation was material. PrimeOne conclusively says, based on the deposition testimonies of White and Jarvis, that it would not have issued the policy or would have charged a higher premium on the policy had it known the correct information. (ECF No. 18, PageID.276.) But again, the testimonies of White and Jarvis do not provide such a clear picture. True, White testified that if Charmed's answer to the question on the presence of "bouncers, security guards or door persons" changed to yes, "this would make it a material change of the operation" because, while not disqualifying, "it would give us information about the risk and how many employees or what hours bouncers would work, if this was all the hours they were open or weeks, it could change how we view the risk." (ECF No. 18-5, PageID.612–613.) And he also stated that having bouncers, door persons, or security could increase the risk because it is a flag that the establishment has some issues that would need to be consulted about. (*Id.* at PageID.608.) White explained that "if we have bouncers and security people it obviously has some [e]ffect on how customers are treated, what force may be used to control a situation. . . . [I]f somebody has to have a lot of security in operation it may be a different type of operation than one who doesn't." (*Id.*) And he stated that, with the correct information, he would have asked additional questions to assess the risk, such as "how many people, when they work, and so forth." (*Id.* at PageID.620.) He testified that the answers to the subsequent questions could lead to an increase in the premium because "that's where we would surcharge a risk." (*Id.* at PageID.630.)

22

The Court finds that there are genuine issues of fact whether Charmed's misrepresentation about its use of security was material. White's testimony indicates that, had PrimeOne known Charmed employed security, it would have followed up with additional questions about the number of individuals employed and the scope and timing of their work. But the mere fact that Charmed employed security would not have necessarily been disqualifying. (*See* ECF No. 18-5, PageID.612.) White's testimony also shows that, equipped with the correct information, PrimeOne could have added a surcharge based on the underwriter's risk evaluation, and it could have charged a higher premium depending on the information that was subsequently provided to it. (*Id.* at PageID.630.) But the fact that PrimeOne *could* have charged a higher premium is insufficient for the Court to find, as a matter of law, that PrimeOne *would* have charged a higher premium knowing only that Charmed employed security.

Instead, issues of fact and credibility about the materiality of the use of security personnel remain. For example, O'Neil's affidavit says that the workers PrimeOne alleges were "bouncers, security guards, or door persons" worked only on busy days and that there were only one or two of them, but the record also shows dozens of checks and cash stubs written out for security to multiple individuals, and consistent weekly expenses for security. (*See* ECF Nos. 17-2, 18-14.) A jury must consider how many "bouncers, security guard, or door persons" were actually employed by Charmed, how often they worked, when they worked, what their exact roles and job functions were, and whether those facts would have led PrimeOne to

increase the premium on the policy. And if it believed Charmed's version, a reasonable jury could find that PrimeOne would have issued the policy or would not have charged an increased premium if it knew Charmed employed one or two security guards only on busy days. And for the same reasons, summary judgment is denied to Charmed on this issue, too. The Court finds that a jury must decide whether Charmed's misrepresentation about the use of "bouncers, security guards, or door persons" was material.

## VI. Conclusion

In sum, the Court finds that Charmed made two misrepresentations in its application for commercial insurance with PrimeOne, but questions of fact remain as to whether those misrepresentations were material such that PrimeOne would have declined to issue the policy or would have charged an increased premium on the policy.

Accordingly, PrimeOne's motion for summary judgment (ECF No. 18) and Charmed's motion for partial summary judgment (ECF No. 17) are both DENIED.

SO ORDERED.

Dated: June 8, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE